IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | **Criminal No. 1:13-CR-0014** |
| : | |
| **v.** : | **Judge Sylvia H. Rambo** |
| : | |
| **JEROME MARIO BRITTON** : | |

# M E M O R A N D U M

In this criminal case, Defendant was charged with four counts related to his alleged possession of two firearms and narcotics in the Middle District of Pennsylvania. (Doc. 1.) Presently before the court is Defendant's motion to suppress, in which he seeks to suppress physical evidence that was seized pursuant to a search of his home while he was on parole. (Doc. 20.) For the reasons stated herein, Defendant's motion to suppress will be denied.

## I.        **Background**

On January 30, 2013, Jerome M. Britton ("Defendant") was charged with four counts arising out of his alleged possession of firearms, one of which was allegedly stolen, and narcotics while he was on parole. (*See* Doc. 1.)[1] On March 6, 2013, Defendant filed a motion to suppress and brief in support, which requested that the court suppress any evidence seized from the person or residence of Defendant as

---

[1] The four counts contained in the January 30, 2013 indictment are as follows: (1) Count 1 - possession of a firearm, namely a Izhmash Saiga 7.62 caliber rifle, by a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1); (2) Count 2 - possession of a firearm, namely a Cobray 9mm pistol, by a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1); Count 3 - possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2); and Count 4 - possession with the intent to distribute a controlled substance, namely cocaine base, in violation of 21 U.S.C. § 841(a)(1). (Doc. 1.)

a result of a search on December 17, 2012. (Doc. 20.) The basis for Defendant's motion was succinctly stated as follows:

> On December 17, 2012[,] parole officers did not have grounds to support a reasonable suspicion that the Defendant had committed any violation of his parole. The parole search conducted at the Defendant's residence therefore violated the Fourth Amendment to the United States Constitution; and the two search warrants subsequently secured by the Harrisburg Police Department were tainted by the illegality of the original parole search.

(*Id.* at ¶ 13.) On April 23, 2013, the court conducted a suppression hearing on Defendant's motion.[2] Based upon the following facts established at the hearing, the court finds that the totality of the circumstances, as they existed at the time of the search, supported the parole agent's reasonable suspicion that Defendant was committing a violation of his parole, and therefore, the initial entry by parole agents did not violate Defendant's constitutional rights.

## II.        Findings of Fact

It is well-settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions, and conclusions to be drawn therefrom, are all matters to be determined by the trial judge. *United States v. Staten*, 181 F. App'x 151, 156 (3d Cir. 2006) (citing *Gov't of V.I. v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974) ("[A] fact-finder's determination of credibility is not subject to appellate review.")). At the April 23, 2013 suppression hearing, the Government presented the testimony of

---

[2] The court writes the memorandum without the benefit of the final transcript.

Sergeant Detective Thomas Carter ("Sgt. Carter"), Parole Agent Michael Welsh ("Agent Welsh"), Parole Agent Supervisor Peter Hans ("Supervisor Hans"), Parole Agent Aaron Geedey ("Agent Geedey"), Harrisburg Detective Donald Heffner (Det. Heffner"), and Harrisburg Detective David Lau ("Det. Lau"). In addition to his own testimony, Defendant presented the testimony of his mother, Deidre Walker ("Walker"), and his girlfriend, Raquel Blackston ("Blackston"), who is also the mother of his child, J.B. Based upon the witnesses' testimony presented at trial and for the reasons that follow, the court found the testimony of the parole agents more credible than that of Defendant or Blackston. Thus, the credible evidence offered at the suppression hearing established the following facts.

On September 19, 2002, Defendant was convicted in the Dauphin County Court of Common Pleas, and was thereafter convicted in the Erie County Court of Common Pleas on October 12, 2006. Defendant was released from incarceration on his state convictions on June 30, 2011, at which time he was placed under the supervision of the Pennsylvania Board of Probation and Parole. Defendant was subject to strict conditions while on parole. Among these conditions, Defendant agreed to: comply with all municipal, county, state, and federal criminal laws (Gov. Ex. 1, ¶ 4)[3]; abstain from the unlawful possession or sale of narcotics, dangerous drugs, controlled substances, and drug paraphernalia (*Id*. at ¶ 5a); refrain from the possession of firearms, ammunition, or other weapons (*Id*. at ¶¶ 5b, 7); refrain from the possession of alcohol or regularly visiting establishments that dispense alcohol (*Id*. at ¶ 7); refrain from contacting or associating with persons who sell or use drugs

---

[3] Government's Exhibit 1 is a document titled "Conditions Governing Parole/Reparole," and was admitted into the record at the April 23, 2013 suppression hearing.

(*Id*.); refrain from assaultive behavior (*Id*. at ¶ 5c); and submit to urinalysis testing, and achieve negative test results for the presence of controlled substances or other drugs (*Id*. at ¶ 5a). In addition, Defendant expressly agreed to warrantless searches of his person, property, and residence by parole supervision staff. This condition stated that:

> I expressly consent to the search of my person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole. Any items, in the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process.

(Gov. Ex. 1, p. 1.)

Defendant was supervised by parole agents from the Harrisburg District Office of the Pennsylvania Board of Probation and Parole, the office which handles cases in the area of Defendant's approved residence. Agent Geedey of that office began to supervise Defendant in 2012. Agent Geedey also supervised Defendant's brother, Dion Britton.

The search at issue in this matter arose following the death of Dion Britton ("Dion").[4] On Saturday, December 15, 2012, Dion sustained two gun shot wounds. An individual, who was with Dion at the time of the shooting, called Dion's mother, Walker, for assistance. Walker contacted Defendant, and she and Defendant transported Dion to the hospital.

Unfortunately, Dion's injuries resulted in his death. Sgt. Carter of the Harrisburg Police Bureau met Defendant and Walker at the hospital. Defendant was

---

[4] Dion Britton is referred to by his first name for ease of identification and clarity, and the court means no disrespect thereby.

4

uncooperative with Sgt. Carter's inquiries, inasmuch as Defendant refused to identify an individual, who Sgt. Carter represented was a person of interest, in a photo array.[5]

During his preliminary investigation, Sgt. Carter received information that Defendant threatened the well-being of the unidentified individual who shot his brother via a post on the social media website, Facebook.[6] Sgt. Carter also learned that the person of interest was being supervised by the Pennsylvania Board of Probation and Parole. On Monday, December 17, 2012, Sgt. Carter went to the parole office for the purpose of furthering the investigation of Dion's death. Sgt. Carter testified that he spoke with Agent Welsh, who was the supervising agent for the person of interest. Agent Welsh and Sgt. Carter exchanged information before Sgt. Carter left the parole office.

Agent Welsh testified that, following his encounter with Sgt. Carter on December 17, 2012, he received an anonymous phone call on his work-related mobile phone. The unidentified caller indicated that Defendant was "next." Agent

---

[5] Defendant testified as to his interaction with Sgt. Carter at the hospital on December 15, 2012. Defendant confirmed that he declined to be of assistance to Sgt. Carter, inasmuch as he did not want to be involved with the investigation and refused to confirm the identity of the person of interest from the photo array.

[6] Defendant testified he did not use any social media website. Walker and Blackston corroborated that testimony. Specifically, Walker testified that she did not believe that Defendant had a Facebook account. Similarly, Blackston testified that, based on her knowledge, she believed that Defendant did not have a Facebook account, that Defendant had never used another person's Facebook account, and that Defendant did not know how to operate a computer. The court need not make a finding as to whether Defendant actually used a Facebook account. The court found credible the testimony of Sgt. Carter related his receipt of information that Defendant used social media to lodge a threat against the individual who shot his brother. That information was passed to the parole agents. Thus, the evidence related to any form of social media was that the parole agents believed, through communications from Sgt. Carter, that a threat to Dion's shooter was made via Facebook, indicating that Defendant would seek retaliation for the death of his brother. The veracity of whether Defendant in fact made such a threat is not at issue. Rather, the agents' belief that Defendant had made a threat against the individual is material as it relates to the reasonableness of the agent's suspicion that Defendant possessed a weapon to act on the threat, or the intent and means to carry on assaultive behavior.

Welsh interpreted the call as a threat against Defendant, which caused Agent Welsh to have concern for Defendant's safety. Agent Welsh testified that he did not recognize the caller's voice, that there was no call-back number, and there was no tracking capabilities on the call.

Agent Welsh communicated his receipt and the threatening nature of the call to Agent Geedey, Defendant's supervising agent. Agent Geedey informed his supervisor, Supervisor Hans, that Dion was shot and killed two days earlier, that he also supervised Dion's brother, Defendant, and that Agent Welsh had received a phone call indicating that Defendant's life may be in jeopardy. Supervisor Hans testified that, after being told of the relationship between Dion and Defendant, he told Agent Geedey that they had to find and search Defendant, because he was concerned of possible retaliation. Supervisor Hans contacted Sgt. Carter to verify the information he had learned from Agent Geedey. Sometime during that morning, Supervisor Hans additionally learned of Defendant's purported social media posting. That same morning, Supervisor Hans informed Agent Geedey that Walker indicated that Defendant would seek retaliation against the individual that killed Dion.[7]

Agent Geedey's attempt to contact Defendant by telephone was unsuccessful because Defendant's phone was either turned off or not in service. At that point, Agent Geedey assembled nine agents to assist him in visiting Defendant at

---

[7] At the suppression hearing, Supervisor Hans testified that he believed Sgt. Carter informed him that Walker had said "that the police better get Dion's murderer before [Defendant] does or they will have another murder." However, at the hearing, Sgt. Carter testified that he did not make this statement. Moreover, Walker testified that she did not make any such statement. Thus, whether Walker actually made the statement is unclear. Nonetheless, the court found credible Supervisor Hans's testimony that he was told, through some source, that Walker made the aforementioned statement. Thus, the statement is considered for purposes of determining whether the agents had reasonable suspicion that there was evidence of a violation of Defendant's parole.

his registered address, 2611 North Fourth Street, in Harrisburg, Dauphin County, Pennsylvania, the residence where Agent Greedy had previously visited Defendant. Agent Geedey explained that he typically does not have such a large team of agents accompany him for a parolee visit, but he was concerned that a dangerous situation may arise, considering Defendant's threats of retaliation as well as the threat against Defendant's life.

Upon arriving at Defendant's residence, the nine agents positioned themselves at the front and rear of the house. At least four agents, including Agent Welsh, Agent Geedey, and Supervisor Hans, were positioned on the front porch ("Front Team"). Several other agents were positioned in view of the rear door ("Rear Team"). The Front Team knocked on the outermost door, which was described as a locked storm door comprised of screen and glass. After several minutes, Defendant's girlfriend, Blackston, responded through the locked storm door, indicating that Defendant was not home, and walked away abruptly. Agent Geedey testified that he found this response atypical as compared to previous visits, inasmuch as Defendant was typically home alone. Moreover, Agent Welsh testified that, from the porch, he could see a male and a female individual inside the living room.[8] Shortly thereafter, a member of the Rear Team relayed to the Front Team that Defendant had emerged from the back door, unleashed a pit bull dog that was in the back yard, and brought the unleashed dog inside the house.

---

[8] The evidence presented at the suppression hearing established that there were only four individuals inside the house at the time the agents made initial contact. Those individuals were: Defendant, Blackston, Blackston's twenty-year-old female cousin, and the thirteen-month-old child of Defendant and Blackston, J.B.

Defendant eventually came to the front storm door. Through the storm door, the agents requested that Defendant speak with them and directed Defendant to come outside. Defendant refused to comply. Defendant testified that he inquired as to the reason the house was surrounded by parole agents, to which Agent Geedey responded that he and the agents were concerned about Defendant's safety and the safety of others.[9] Agent Geedey testified that, although Defendant refused his direction to open the door and come outside, Defendant invited him inside the residence to speak.[10] Agent Geedey agreed, and Defendant unlocked and opened the storm door and stepped outside onto the porch.

The agents requested that, for purposes of officer safety, Defendant submit to being placed in handcuffs.[11] Although Defendant initially refused, he eventually complied with the agent's request to be placed in handcuffs.[12] The agents then escorted Defendant inside the house and placed Defendant on the sofa within the living room. Agent Welsh testified that, upon entering the residence, he and several other agents began a cursory search for safety. At this time, Agent Welsh saw an assault rifle bullet in plain view on the television stand. In addition, during

_____

[9] In response to Agent Geedey's explanation, Defendant testified that he told the agents that he did not need any protection. Geedey denied that Defendant made this statement.

[10] Both Defendant and Blackston testified that Defendant never invited the agents inside the house. However, the Government did not argue that the agent's entry into Defendant's home was lawful based on his consent. Thus, while the court found Agent Geedey's testimony entirely credible, it need not consider whether Defendant consented to the agent's entry into his home. *See infra*, n. 19.

[11] At the hearing, Agent Welsh testified that it is protocol to place the parolee in handcuffs if the circumstances of the encounter appear suspicious. Agent Welsh testified that such circumstances were present during the encounter with Defendant.

[12] Defendant testified that he complied with the agent's request to be placed in handcuffs only when an agent withdrew her taser from its holster.

the search of the kitchen, other agents discovered what appeared to be crack cocaine, plastic baggies, and a digital scale. Upon finding the suspected narcotics, the agents terminated the cursory search and called the Harrisburg Police Bureau. Detectives Heffner and Lau responded. After being briefed on the situation, Det. Lau applied for and received a search warrant for Defendant's residence. The search of the residence, conducted pursuant to the warrant, produced, *inter alia*, two firearms,[13] cocaine base, razors, plastic baggies, and a digital scale.

Defendant testified on his own behalf. The court found Defendant's version of the events highly suspect. Defendant testified that, in the early afternoon of December 17, 2012, he was at his registered address at 2611 North Fourth Street. Defendant testified that Blackston had brought J.B. over for a visit,[14] and that Blackston was accompanied by her twenty-year-old female cousin ("Cousin"), who was helping her with J.B. because Blackston had recently given birth. At some point, Defendant had to deliver an item to his mother, and asked Blackston to remain in his house with J.B. until he returned, despite a Final Protection From Abuse Order ("PFA") being in place that prohibited any contact between Defendant and Blackston.[15] Defendant testified as to the reason for his request, explaining that he

---

[13] It was subsequently determined that Defendant's fingerprint was on least one of the seized firearms.

[14] Defendant testified that he and Blackston have a custody order in effect related to J.B. Pursuant to that order, Blackston would regain custody at 4:00 p.m. on that Monday.

[15] Defendant testified that the Final PFA allows for limited contact between him and Blackston. The Final PFA, which was entered on July 27, 2012, by the Honorable Andrew H. Dowling of the Dauphin County Court of Common Pleas, provided, in pertinent part, as follows:

> [Defendant] is prohibited from having ANY CONTACT with [Blackston] either
> directly or indirectly, or any other person protected under this order, at any

(continued...)

wanted to see his daughter upon his return from delivering the item to his mother. Blackston agreed.

Defendant testified that he was gone for ten to fifteen minutes. Defendant testified that, despite his purported desire to see his daughter again upon his return, he went directly upstairs to a bedroom and fell asleep, without first indicating his arrival to Blackston, who was purportedly in the kitchen.

According to Blackston's testimony, at the time she answered the parole agents' knocking on the door, she was unaware that Defendant had returned and was upstairs sleeping. Blackston testified that she told the agents what she believed to be the truth. Although she turned the agents away, Blackston requested that Cousin take J.B., who was allegedly sleeping on the sofa, upstairs to Defendant's bedroom. Blackston accompanied Cousin and J.B. upstairs, and it was only at this time that she discovered Defendant sleeping on the bed. She woke Defendant, and informed him of the parole agents requesting to speak with him. Defendant testified that he initially dismissed Blackston, but became concerned once she informed him that there were many agents present. At that point, Defendant went downstairs.

Defendant testified that he heard the pit bull dog barking in the backyard, and, before responding to the parole agents at the front door, went out the

---

location, including but not limited to any contact at [Blackston]'s or other
protected party's school, business, or place of employment. [Defendant] is
specifically ordered to stay away from the following locations for the duration
of this order.

*Blackston v. Britton*, No. 2012-cv-5929, PFA at p. 2 of 6 (Pa. Com. Pl. Dauphin Cnty. July 26, 2012)
(emphasis in original). The PFA allows for: "limited peaceful contact regarding children." *Id*.
Moreover, while the Temporary PFA prohibited Defendant's contact with J.B., the Final PFA did not
name J.B. as a protected person. *See id*. The Final PFA is set to expire on July 26, 2013. *Id*.

back door to put the dog in a cage in the basement. It was only then that Defendant responded to the agents.

Defendant initially addressed the agents through the locked storm door. Defendant testified that he inquired into the purpose of the parole agents' presence, to which Agent Geedey responded that they were there for his protection and out of their concern for others and that they needed to speak with Defendant. Defendant testified that he was uneasy because of the number of agents present at his house, and called his attorney while in front of the agents.[16] After receiving assurance from his attorney's secretary, Defendant agreed to step outside, at which point the agents requested he submit to being handcuffed. At the hearing, Defendant admitted he initially refused to comply with the agent's request, but eventually agreed to be placed in handcuffs once a parole agent withdrew her taser. Defendant was then brought into his house and placed on the couch, at which point Agent Geedey explained that they were there to do a parole search.

Although his testimony was largely corroborated by Blackston, the court nonetheless found Defendant's account of the circumstances immediately preceding the encounter less than credible. Initially, the court notes that Defendant's purported trip to his mother's residence is highly suspect. Defendant testified that, the reason he requested Blackston to remain at the residence with J.B., and knowingly violate the terms of the Final PFA, was so he could see J.B. again before

---

[16] Agent Welsh, Agent Geedey, and Supervisor Hans denied that they witnessed Defendant make such a call, despite the fact that this alleged phone call was made directly in front of the parole agents and through the screen and glass storm door. No additional evidence was presented to corroborate Defendant's testimony that he made such a call.

she left with Blackston. This, of course, is contrary to his purported actions, namely going directly upstairs to fall asleep upon his return home.

Blackston's corroboration did not remedy the inconsistencies, and in fact, discredited her testimony. Blackston testified it was her belief that Defendant was not home at the time she first made contact with the parole agents, and did not learn Defendant had returned until she went upstairs to show Cousin where to take J.B. The court does not find Blackston's account credible. Defendant testified that, upon his return, he saw Cousin, who presumably saw him, as he had to pass her to go upstairs to the bedroom. Blackston's account would require the court to believe that, despite numerous agents coming to Defendant's house and asking to see Defendant, Cousin did not indicate to Blackston that Defendant had returned, even though Cousin was positioned in such a manner that she would have witnessed the interaction between Blackston and the parole agents.

Moreover, Blackston's credibility was virtually destroyed on cross-examination, during which she testified that, despite being in the kitchen for, at least, the entirety of Defendant's trip to his mother's house, she did not notice the cocaine, baggies, razors, or digital scale, all of which were located in plain view in the kitchen. Moreover, Blackston testified that, although she was in the livingroom watching television that day, she did not see the bullet on the television stand, which was noticed by Agent Walsh almost immediately upon his entry.

The court now turns to its analysis of Defendant's motion.

**III.** **Legal Standard**

Defendant moves to suppress the evidence seized as a result of the December 17, 2012 search, contending that the parole agents lacked reasonable suspicion to search his residence. At the outset, the court concludes that Defendant has met his initial burden to establish a colorable basis for the instant motion to suppress evidence because it is undisputed that the officers executed a warrantless search of Defendant's residence, potentially implicating Defendant's Fourth Amendment rights to be free from such warrantless searches.[17] *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995) (citation omitted) ("[O]nce the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."). Therefore, in the matter *sub judice*, the burden shifts to the Government to show that the search was reasonable and consistent with applicable Fourth Amendment jurisprudence. *Id.*

The Fourth Amendment provides, in pertinent part, that people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Generally, the Fourth Amendment mandates that government officials must establish probable cause and obtain a warrant prior to conducting a search or seizure. *Id.* ("[N]o Warrants shall issue, but

---

[17] Both the Government and Defendant characterize the agents' conduct as a warrantless search of Defendant's residence. To clarify, the evidence presented at the hearing established that the agents entered Defendant's residence to speak with him while he was on parole. It appears that the bullet and narcotics were discovered by the parole agents in plain view while they conducted a protective, cursory sweep of the residence. Upon the agents' discovery of these items, the search was terminated and the agents contacted police for a search warrant, using the contraband as the basis for the affidavit in support of the search warrant. (Doc. 20-4.) Thus, the issue turns on whether the parole agents were lawfully in Defendant's residence at the time they saw the narcotics and bullet.

upon probable cause."). One well-established exception to the warrant requirement is the parole/probation exception. The Supreme Court has recognized that individuals who are released on probation "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (alterations in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). The United States Court of Appeals for the Third Circuit has extended the reasoning of *Griffin* to parolees. *See United States v. Hill*, 967 F.2d 902, 909 (3d Cir. 1992) (holding that "*Griffin*'s reasoning applies equally to the parole system," but "no specific statutory or regulatory provision [under Pennsylvania law] authorized the defendant's parole agents to conduct the warrantless search of his store"). In the cases brought against parolees or probationers, "the requisite level of suspicion is reduced and a warrant is not required" if "reasonable suspicion"[18] exists

---

[18] At the hearing, as well as in their respective briefs, counsel for Defendant and counsel for the Government agreed that whether the agents acted lawfully turns on whether they had reasonable suspicion, relying on *United States v. Knights*, 534 U.S. 112, 119 (2001), a case recognizing that probationers do not enjoy the liberty of other citizens. Neither the Government nor Defendant cite to *Samson v. California*, 547 U.S. 843 (2006), a subsequent case in which the Supreme Court took *Knights* a step further and held that, under California law and the Fourth Amendment, a law enforcement officer could conduct a suspicion-less search of a California parolee. *Id.* at 846 ("We granted certiorari to decide whether a suspicion-less search, conducted under the authority of this [California] statute, violates the Constitution. We hold that it does not."). In one case decided after *Samson*, namely *United States v. Henry*, 360 F. App'x 395, 397 (3d Cir. 2010), the Court of Appeals for the Third Circuit explicitly declined to rule on the question of whether the Supreme Court's decision in *Samson* altered its holding in *Baker*, 221 F.3d at 445-46, in which the Third Circuit held that Pennsylvania law requires that the Commonwealth's parole officers have reasonable suspicion to search Pennsylvania parolees. *Henry*, 360 F. App'x at 397 ("We agree . . . that the parole agents clearly possessed reasonable suspicion to conduct the searches, and we therefore need not decide whether the Supreme Court's decision in *Samson v. California* . . . otherwise permits suspicion-less searches in the current circumstances."). Other district courts within this circuit have acknowledged that the Third Circuit has not given crystal clear guidance on whether *Samson* would allow a suspicion-less search. *See, e.g., United States v. Rivera*, 727 F. Supp. 2d 367, 373-74 (E.D. Pa. 2010) (holding that *Baker* retains its vitality after *Samson*). In any event, the issue of whether *Samson* altered the Fourth Amendment jurisprudence with

(continued...)

to conduct a warrantless search or seizure. *United States v. Baker*, 221 F.3d 438, 443–44 (3d Cir. 2000). The Third Circuit has explained that the reasonable suspicion standard is a:

> less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). The Court of Appeals has also recognized that the reasonable suspicion standard is applied in cases such as this one wherein the Defendant voluntarily executes the standard Pennsylvania consent form, authorizing warrantless searches of his approved residence by parole officers. *See Baker*, 221 F.3d at 448 ("We conclude that Pennsylvania would construe the consent form to include an implicit requirement that any search be based on reasonable suspicion.").

Reasonable suspicion has been referred to as an "elusive concept." *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006). The court must look at the "'totality of the circumstances' of each case to see whether the officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). This type of determination permits "officers to draw on their own experience and specialized training to make inferences from and deductions about

---

(...continued)
regard to Pennsylvania parolees was neither argued nor briefed in the matter *sub judice*. In addition, the court finds that there was at least reasonable suspicion for the agents to conduct a parole search. Thus, the court need not address whether Defendant adequately consented to the agents' entry or whether a suspicion-less search is permissible under these circumstances.

the cumulative information available to them that 'might well elude an untrained person.'" *Id*. (citing *Cortez*, 449 U.S. at 418). Thus, in deciding what is reasonable, a court is to apply an objective standard, looking at whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the search was permissible. *United States v. Harrison*, 689 F.3d 301, 309 (3d Cir. 2012) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)).

Thus, the burden is on the Government to prove that the parole officers had reasonable suspicion that Defendant had engaged in criminal conduct or committed a parole violation prior to executing the warrantless search of his residence. *See Johnson*, 63 F.3d at 245 (citation omitted). If the Government does not establish reasonable suspicion for the search, the search is illegal and any evidence obtained by law enforcement as a result of the unlawful search must be suppressed as the "fruit of the poisonous tree." *Brown*, 448 F.3d at 244; *see also Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (citation omitted).

## IV.      Discussion

In this case, Defendant argues that the Government has failed to meet its burden to show that the officers possessed reasonable suspicion of any criminal activity or parole violations prior to executing the search of his residence. Defendant maintains that Agent Geedey and the other officers acted pursuant to: (1) information from an unidentified individual's unsolicited telephone call to Agent Welsh that, at best, indicated Defendant was a potential *victim* rather than a *perpetrator*; (2) unsubstantiated information from Sgt. Carter regarding Walker's statement related to Defendant that Sgt. Carter denies ever having made; and (3) that the agents made no

effort to corroborate any of the information they obtained prior to executing the search. In response, the Government maintains that, in light of the totality of the circumstances known to the parole agents at the time of the entry, it has met its evidentiary burden to demonstrate that the officers had reasonable suspicion to believe that Defendant possessed a firearm in violation of the conditions of his parole. In short, Defendant's challenge turns on the circumstances that existed at the time of the agent's entry,[19] as the only evidence presented in support of the search warrant was evidence discovered by the agents in plain view following their entry. For the following reasons, the court agrees that the agents had reasonable suspicion to believe that Defendant committed a parole violation or crime.

The totality of the circumstances known by the parole agents at the time of their entry included: (1) their learning that Defendant's brother had been shot and killed two days prior; (2) knowledge that Agent Walsh's had received an anonymous telephone call which indicated that Defendant's life was threatened; (3) information that Defendant had posted on a social media website that he intended to retaliate against his brother's killer; (4) indication that Walker had said that the police better find Dion's killer before Defendant does or they will have another murder to investigate; (5) Agent Geedey's unsuccessful attempt to reach Defendant by telephone, due to the phone being disconnected or turned off; (6) a delay in any

---

[19] Significantly, Agent Geedey, whom the court found entirely credible, testified that Defendant invited the agents into his residence as an alternative to the request that Defendant step outside. The court notes that, although the decision herein turns on the reasonable suspicion rather than consent, there is sufficient credible evidence to conclude that Defendant did, in fact, invite the agents' entry. While Defendant testified that he did not invite Agent Geedey into his residence, according to the Agent's testimony, it was Defendant himself who suggested the Agent come inside rather than Defendant step outside. The court deems that suggestion, when combined with Defendant's unlocking the storm door, to constitute consent for the agents to enter.

occupant of the residence responding to the agents' knocking on the door; (7) Blackston telling the agents that Defendant was not home, which was contradicted by the independent observations of Agent Welsh through the window; (8) Defendant being seen coming out the back door before he met with the agents on the front porch, after the agents were told he was not home; (9) Defendant bringing an aggressive[20] pit bull dog into the house before meeting the agents at the front door; and (10) Defendant's suspicious behavior during his initial encounter with the agents, including: (a) Defendant's initial refusal to speak with the agents; (b) Defendant's initial refusal to open the storm door; and (c) Defendant's initial refusal to be placed in handcuffs, despite the officers telling him it was for officer safety.

Moreover, the totality of the circumstances focuses on what the officers knew at the time, not the accuracy of what they knew. *See Harrison*, 689 F.3d at 309-10 (citing *Rodriguez*, 497 U.S. at 186) ("The law does not require that police officers always be factually correct; it does demand, however, that they always be reasonable."); *see also United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d. Cir. 2006). Specifically, the court found credible that the agents believed, at the time of their entry: (1) that Defendant was home, despite their being told he was not; (2) that Defendant had threatened the life of another individual; and (3) that Defendant's life was being targeted.

Although defense counsel zealously argued at the suppression hearing that the phone call Agent Walsh received was, at best, indicative that Defendant was

---

[20] This adjective is added by the court based on Defendant's testimony that the dog was barking in the backyard prior to his unleashing and taking the dog inside. This attribute is not intended to indicate that the dog was, in fact, violent; rather, it goes to the agents' knowledge that Defendant had brought a barking pit bull inside the residence for an unknown purpose.

a potential victim rather than a parole violator, the court does not agree that the phone call should not be considered in the totality of the circumstances analysis. Supervisor Hans has over a decade of experience as a parole agent, and had information that Defendant was being threatened. His desire to search Defendant was based on his experience and recognition that parolees who are threatened with violent crimes are more likely to obtain firearms to protect themselves. In light of the agent's knowing that Defendant's brother was shot and killed two days prior, and Agent Welsh's receiving a call indicating that Defendant "would be next," it was reasonable, under the circumstances, to conclude that Defendant would likely have a firearm to protect himself. *See United States v. Webster*, Crim. No. 07-cr-0115, 2008 WL 4610246, *2 (D. Del. Oct. 17, 2008) (finding reasonable suspicion to conduct a search based in part on the fact that defendant was the target of a shooting and had a family member shot within days thereafter), *aff'd*, 400 F. App'x 666, 667-68 (3d Cir. 2010); *see also United States v. Williams*, 417 F.3d 375-76 (3d Cir. 2005) (finding reasonable suspicion to conduct a search based in part on the fact that probation officer had received tips that probationer had been present at a shooting for which he was a target). Furthermore, the agents had information that Defendant had threatened another person. Thus, the totality of the circumstances provided ample basis for the agents to have reasonable suspicion that they would find evidence that Defendant was in the possession of a weapon, which was evidence he violated the conditions of his parole and evidence that he was committing a crime. Accordingly, the court will not suppress any evidence seized from Defendant's person or residence during the December 17, 2012 search.

**V.**       <u>Conclusion</u>

Based on the totality of the circumstances and in light of the parole agents' experience and training, the court concludes that the Government has sustained its burden to prove that the agents had reasonable suspicion to believe that Defendant had engaged in criminal conduct or committed a parole violation prior to their entry into Defendant's residence. Accordingly, Defendant's motion to suppress will be denied.

An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated: May 2, 2013.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :
    :   **Criminal No. 1:13-CR-0014**
    :
    **v.**    :
    :   **Judge Sylvia H. Rambo**
    :
**JEROME MARIO BRITTON**    :

# O R D E R

    For the reasons set forth in the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT** Defendant's motion to suppress (Doc. 20) is **DENIED**.


                                s/Sylvia H. Rambo
                                United States District Judge

Dated: May 2, 2013.